FILED BY _____ AT _____ D.C.

Feb 17, 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Feb 09 2026

KEVIN P. WEIMER , Clerk

By: B. Evans
Deputy Clerk

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

PATRICK ANDRAOUS

**CRIMINAL COMPLAINT**

Case Number: 1:26-mj-0141

**UNDER SEAL**

OUR CASE NO: 26-6085-MJ-AUGUSTIN-BIRCH

I, the undersigned complainant depose and say under penalty of perjury that the following is true and correct to the best of my knowledge and belief. Starting on or about December 19, 2024, and continuing until at least on or about March 6, 2025, in the Northern District of Georgia and elsewhere, the defendant, PATRICK ANDRAOUS, aided and abetted by, and aiding and abetting, others unknown, knowingly devised and intended to devise a scheme and artifice to defraud VICTIM COMPANY, and to obtain money and property from VICTIM COMPANY by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, and for the purpose of executing the scheme and artifice to defraud, with the intent to defraud, caused to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds,

in violation of Title 18, United States Code, Section(s) 1343 and 2.

I further state that I am a(n) Special Agent of the FDIC-OIG and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.    Yes

_Jacob Evans_
Signature of Complainant

Jacob Evans

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

February 9, 2026                                    at    Atlanta, Georgia
Date                                                          City and State

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                Signature of Judicial Officer

AUSA Samir Kaushal / 2025R00384

I, Jacob M. Evans, hereby depose and state under penalties of perjury as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a criminal complaint alleging that **Patrick Androus** has violated Title 18, United States Code, Sections 1343 (wire fraud) and 2 (aiding and abetting).

2.      I am a Special Agent with the Federal Deposit Insurance Corporation, Office of Inspector General (FDIC-OIG), and have been since May 2018. I am a Task Force Officer with the Federal Bureau of Investigation's Greater Atlanta Financial Crimes Enforcement Task Force. Prior to my employment with FDIC-OIG, I was a Special Agent with Internal Revenue Service, Criminal Investigation from July 2009 to May 2018. I have investigated criminal violations relating to white-collar crime, including mail fraud, wire fraud, bank fraud, access device fraud, money laundering, and tax fraud. I have experience investigating financial crimes dealing with cross-border transactions.

3.      The information in this affidavit is a combination of my personal knowledge of this investigation, the knowledge of other duly sworn law enforcement officers or agents, documents obtained from various financial and other institutions, and information obtained from third-party witnesses. I have not included every fact known to me about this case; rather, I have limited this affidavit to those facts relevant to the issuance of a criminal complaint. This affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4.      Internal Revenue Service – Criminal Investigation, the Federal Bureau of Investigation, and Federal Deposit Insurance Corporation – Office of Inspector General are

investigating the theft of approximately $5.5 million from a US-based corporation, whose headquarters is in Atlanta, Georgia. The company markets itself as: "The smarter corporate payments company. Providing a modern day, smarter way to simplify how you make payments." The company has a subsidiary ("VICTIM COMPANY") that focuses on foreign currency exchange contracts and cross-border payments. All emails from the VICTIM COMPANY pass through the company's data centers in Atlanta through a mail relay that scans internal and external emails before routing them on to the addressee. VICTIM COMPANY has financial services licenses in multiple countries, including a U.S. money services business ("MSB") license from FinCEN and a Canadian MSB license from FinTRAC.

*The Defrauding of Victim Company*

5.      On or about December 19, 2024, an individual using the name "Jerry Moudilos," began the process of opening a corporate account with VICTIM COMPANY under the name of 9380-8046 Quebec Inc. ("98Q"). The corporate account for 98Q at VICTIM COMPANY is referred to as the 98Q account in this affidavit. As explained below, this individual is believed to actually be **Patrick Andraous**, a resident of Canada.

6.      On or about December 19, 2024, an employee from VICTIM COMPANY asked "Moudilos" via email to provide a void check for both his USD and CAD bank accounts. In response, on the same day "Moudilos" provided (as an attachment to an email) what appears to be a void check for a bank account for 98Q. In reality, the void check was for another business, 9519-5475 Quebec Inc. ("95Q"). The purported voided check for 98Q was actually for a Desjardin account for 95Q that ended in 0290 (the "x0290 account") and was owned and controlled by an individual using the name "Patrick Theodore." According to Quebec Business

Registrations, "Patrick Theodore" is the largest shareholder/majority shareholder and President of 95Q. As explained below, this individual is also believed to actually be **Patrick Andraous**.

7.      Between January 7, 2025, and March 4, 2025, "Moudilos," through 98Q, instructed VICTIM COMPANY to debit the x0290 account, in total for approximately $5,545,418.55 USD. During this time frame, in response to VICTIM COMPANY's inquiries about 98Q's funds, on or about February 20 and 26, 2025, "Moudilos" provided what appear to be screenshots of a Desjardins bank account showing a positive account balance in the millions of US dollars ($3.188M USD on 02/20/2025 and $4.229M USD on 02/26/2025). "Moudilos" presented these screenshots as support for showing that 98Q possessed funds to support the transactions he was requesting to execute with VICTIM COMPANY.

8.      On the corporate application for the account with VICTIM COMPANY, "Moudilos" stated that the x0290 account was his or under his control.

9.      In Canada, no EFT-debit truly clears the debiting party's bank account until 90 days after the debit. When VICTIM COMPANY attempted to EFT-debit the x0290 account, the debits initially appeared to transfer into VICTIM COMPANY's bank account as tentative-credits. But ultimately all the EFT-debits bounced, were returned, or were dishonored in four batches between March 5 and March 12, 2025. In some instances, the transfers were dishonored as NSF (not sufficient funds) while in other cases the owner of the x0290 account, "Patrick Theodore," told Desjardins that there was no agreement (the term in Canada is a "pre-authorized debit agreement") authorizing and directing VICTIM COMPANY to debit that bank account.

10.      On or about March 5, 2025, an employee for VICTIM COMPANY emailed "Moudilos" to let him know that one of the debits they tried to pull from the x0290 account came back as "NSF" or non-sufficient funds. "Moudilos" responded via email stating that, "Apparently

they tried to reach me, although I have no missed calls. They wanted to confirm if I had authorized these debits. They blocked them when they blocked it when they 'couldn't' get in touch with me. You can process it again and it'll go through they said." The VICTIM COMPANY employee then requested that "Moudilos" wire the funds to VICTIM COMPANY as soon as possible. "Moudilos" responded on March 6, 2025, that he would "arrange a wire right when they open and send you confirmations asap. Very sorry but it was completely out of my hands. Sending confirmations shortly once banks are open."

11.     Before VICTIM COMPANY learned that the funds from the x0290 account would not actually be credited, VICTIM COMPANY permitted the user of the 98Q account to conduct transactions, in effect, VICTIM COMPANY was "fronting" the money under the belief that the transfer from the x0290 account would clear without issue.

*The Conversion of Funds to Virtual Currency*

12.     Between February 5, 2025, and March 6, 2025, approximately $5.1M USD from the 98Q account was sent to Netcoins,[1] where a portion of the funds were converted to approximately 57.7 Bitcoin and sent to a Bitcoin wallet with an address beginning with bc1qte (the "bc1qte wallet").

13.     On or about February 18, 2025:

a.     At approximately 16:57:24, approximately 7.48498556 bitcoins (valued at approximately $715,160.54 USD at the time of the transaction) was sent from the bc1qte wallet to a Coinsquare[2] account in the name of 9519-5475 Quebec Inc. (the "95Q Coinsquare account"). The authorized user and beneficiary of that

---

[1] Netcoins is a cryptocurrency exchange that operates in Canda.

[2] Coinsquare is a cryptocurrency exchange that operates in Canada.

account was "Patrick Theodore," and a Canadian Driver's License in that name, with the following identifiers was provided to Coinsquare: Address: 12 Wellesworth Dr, Etobicoke, ON M9C4P6, ON, DOB: 08/23/1988, Ontario Driver's License Number T33566170880823.

    b.    At approximately 17:50:48, 95Q Coinsquare account sold 7.48 BTC for approximately $999,888.62.24 CAD.

    c.    At approximately 19:19:22, $999,589.24 CAD was wired to a Canadian Bank account in the name of 95Q.

*Patrick Andraous's December 2025 visit to the United States*

14.    On December 15, 2025, **Andraous** sought entry to the United States at Montreal Preclearance and was selected for a baggage exam due to his alleged involvement in an internet fraud scheme. During the baggage exam, **Andraous** had a wallet that contained an Ontario driver's license bearing his photograph but a different name and date of birth. This driver's license was in the name of "Patrick Theodore." **Andraous** also had multiple credit cards that bore the names of other individuals.

15.    **Andraous** was also in possession of the electronic devices, to include an iPhone, Google Pixel, Vivo Pro and a Apple Mac Laptop **(Subject Devices)**, some of which were searched by Customs and Border Protection ("CBP").

16.    Due to the presence of documents containing multiple different identities, CBP approved a basic electronic media search of **Andraous's** electronic devices to determine if his aliases related to Transnational Organized Crime. The search was approved. **Andraous** was notified of the search and voluntarily provided the unlock information for his three cellular telephones.

17.     During the search of the cellular telephones, CBP discovered the following on the **Subject Devices**:

    a.  Numerous messages and screenshots indicating bank transfers and transactions, some totaling millions of dollars. (Pixel and iPhone.)

    b.  Photographs of what appears to be a fraudulent German passport bearing the alias, "Patrick Theodore," and date of birth observed on the fake Ontario driver's license. (Pixel.)

    c.  Messages in a Signal group chat named "6M" where they discussed the movement of money in what they refer to as a "scheme." (iPhone.)

    d.  An email that carbon copied an email address associated with VICTIM COMPANY with a subject line that included VICTIM COMPANY and Q98. (Pixel.)

    e.  An email from an attorney with a subject line that included VICTIM COMPANY and Q98 to "Jerry." The body of the email states "Dear Mr. Moudilos, We have reached out to several times to no avail. Have you retained a lawyer as of yet? We need to finalize the protocol and move this matter forward." (Pixel.)

    f.  A text message string in which **Andraous** appears to be talking with a bank insider at Desjardins who is setting up bank accounts in nominee names. **Andraous** and the insider discuss PII for multiple individuals. (iPhone.)

    g.  A screenshot of the wallet "bc1qt-yss6m." The full address of this wallet is bc1qte3fx5kxd3wkz8mkhzlwntt7v3asaf72myss6m (the bc1qte wallet). (Pixel).

18.     When the search was complete, **Andraous** was advised that he was being released. Upon his release, **Andraous** indicated to CBP that he wished to reveal why he was in

possession of documents that bore different identities. CBP reminded **Andraous** that he had been released and was not being examined any further, but **Andraous** again stated that he wished to provide CBP with additional information about the identity documents. **Andraous** stated that:

a. Starting at a young age, he began playing online poker and became very successful.

b. He would often deposit substantial amounts of money that he won playing online poker to various banks in Canada.

c. The large deposits resulted in suspicion about his finances and he was ultimately banned from doing any banking in Canada.

d. To circumvent restrictions on his banking capabilities in Canada, he obtained information through a search on the Telegram app about a Turkish group that could help him obtain a fraudulent passport.

e. He then obtained a fraudulent German passport and used it to obtain a new Ontario driver's license under a different name and date of birth to open new bank accounts.

f. He admitted he was in possession of credit cards belonging to other people as a result of paying an unidentified contact within an unidentified Canadian bank to allow him to open a bank account using another individual's information.

g. He admitted to having a picture of a fraudulent or false German passport that he stated he purchased online for the purpose of obtaining fraudulent or false Canadian identity documents that he stated he wanted to obtain to open Canadian businesses and Canadian bank accounts related to a gambling scheme that he was a part of.

19.     During the investigation, approximately 17.7 Bitcoin traceable to the original theft from VICTIM COMPANY has been traced into primarily two Stake.com accounts, one of those in the name of **Patrick Andraous**.

20.     Based on my training and experience, I know that:

a.  When virtual currency is stolen, fraudsters generally try to find a way to convert the virtual currency back to fiat currency through cash-out points.

b.  The velocity with which the funds moved through the 95Q Coinsquare account is indicative of being part of a cash-out mechanism.

c.  Using fraudulent or false identity documents when setting up accounts used for cash-out purposes would be ideal as the account does not inherently connect back to the fraudsters.

## **CONCLUSION**

21.     Based on the foregoing, I respectfully submit that there is probable cause to believe that **Andraous** has violated Title 18, United States Code, Sections 1343 (Wire Fraud) and 2 (aiding and abetting).